IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  13-cv-00724-LTB

ENSIGN UNITED STATES DRILLING, INC., and
ENSIGN UNITED STATES DRILLING (CALIFORNIA) INC.,

       Plaintiffs,

v.

WEATHERFORD U.S. LIMITED PARTNERSHIP,

       Defendants.

_____

AMENDED ORDER
_____

This matter is before me on the following motions filed by Defendant Weatherford U.S.

Limited Partnership ("Weatherford"):  1) Defendant Weatherford's Motion for Leave to Amend

Answer [**Doc #80**]; and 2) Defendant Weatherford's Motion for Partial Summary Judgment [**Doc**

**#90**].  Plaintiffs Ensign United States Drilling, Inc. and Ensign United States Drilling

(California) Inc. (collectively, "Ensign") opposed the relief requested.  Oral arguments would

not materially assist me in my determination.  After consideration of the parties' briefs and

attachments, and for the reason stated, I DENY Weatherford's Motion to Amend, but I GRANT

Weatherford's Motion for Partial Summary Judgment as follows.

## I.  BACKGROUND

Ensign is an oil well service contractor.  As part of Master Service Agreement ("MSA")

with a land lease operator, Vintage Production California LLC ("Vintage"), Ensign provided

service rigs (and all related equipment, tools, materials, and labor) for servicing wells located in

Ventura, California.  Ensign's Rig No. 333 contained a rod elevator that Ensign had purchased

from B&H Rig and Tong Sales.  The rod elevator had a safety hook, known as an "RH-35 rod

hook," that had been manufactured by Weatherford.  On May 20, 2011, Ensign employee Ryan

Bolton was severely injured when the rod elevator on Rig. No. 333 fell on him during an

industrial accident.  Ensign asserts that the accident was caused by the failure of the RH-35 rod

hook due to a manufacturing defect.  Following the accident, Ensign filed this lawsuit against

Weatherford in which it asserts claims of: 1) Negligence; 2) Strict Liability; 3) Breach of

Express Warranty; and 4) Breach of Implied Warranty. [Doc #4]

## II.  MOTION TO AMEND

I first address Weatherford's motion to amend its answer pursuant to Fed. R. Civ. P.

15(a)(2) and Fed. R. Civ. P. 16(b)(4).

Ensign filed its complaint against Weatherford on February 11, 2013, in the District

Court for the City and County of Denver.  It was subsequently removed to this Court based on

diversity jurisdiction on March 19, 2013.  Weatherford filed its answer to the complaint on July

15, 2013. [Doc #39]    The deadline for amending pleadings was January 6, 2014. [Doc #50]

Weatherford filed its motion seeking to amend its answer, almost a year out of time, on

December 31, 2014. [Doc #80]  In this motion, Weatherford seeks leave to amend to: 1) admit

the existence of an express warranty; and 2) assert a defense to the damages sought by Ensign

based on the economic loss doctrine. [Doc #88]

First, Weatherford requests to admit that an express warranty governs (and limits) its

liability for the alleged defective manufacture of the RH-35 rod hook in this case based on the

terms and conditions found on the back of its form credit application.  Weatherford argues that

the terms and conditions on its credit application specifically provides that it "warrants

equipment sold pursuant hereto to be free of defects in material and workmanship for a period of one (1) year after the date equipment is delivered," and that its "liability for breach of this warranty is expressly limited to the repair or replacement . . . of any equipment or parts of equipment which prove to be defective during the warranty period." The terms also contain limitations on any consequential or incidental damages. [Doc #90-2]

In response, Ensign asserts that the terms and conditions on the back of Weatherford's blank credit application are clearly inapplicable to this case because Ensign did not execute any such document, as it did not apply for credit with Weatherford, and the form was never presented to, disclosed to or received by Ensign before now. Ensign supports this factual assertion by affidavit. Specifically, Plaintiff's former Assistant District Manager of Well Servicing in California, Richard Green, avers that:

> We did not fill out or agree with any sort of credit application with Weatherford. I have never received or seen the blank Weatherford credit application attached to Weatherford's Motion for Summary Judgment, and its terms were never a part of any contract I am aware of. I obviously did not in any way rely on the blank credit application in my purchase of the Rod Hook [for Plaintiff]. [Doc #94-2, ¶7]

Mr. Green also avers that the only documents Ensign received as part of their purchase of the RH-35 rod hook were the sales materials and the user manual. [Doc #94-2, ¶7]

Weatherford does not dispute that Ensign never contracted or agreed to the terms and conditions by signing or even being aware of Weatherford's credit application. And, Weatherford does not allege that Ensign received, completed, or signed the credit application containing the limited warranty terms. Furthermore, Ensign's express warranty claim raised in this case is not premised on any written agreement between the parties – including the blank credit agreement – but rather is based on the representations made by Weatherford in its

3

marketing materials/ documents and operating manuals related to the performance of its RH-35 rod hook.  Ensign's complaint clearly alleges that Weatherford "utilized advertising, marketing and direct conversations to encourage Ensign's purchase and use of the . . . RH-35 rod hook, and expressly warranted to Ensign that this product was effective, proper and safe for Ensign's intended use." [Doc #4, ¶53]  And, Weatherford "breached their express warranties regarding the merchantability and fitness of the RH-35 rod hook by designing, testing, distributing, manufacturing, advertising, marketing, and selling the RH-35 rod hook with an unreasonably and inherently dangerous and defective latch."  [Doc #4, ¶56]

It is undisputed that the express warranty is inapplicable to this case.  Weatherford has not rebutted Ensign's supported claim that it is not subject to the terms and conditions contained on the back of Weatherford's credit application, as well as Ensign's allegations in the complaint that its breach of express warranty claim is grounded in Weatherford's marketing and operating materials for the RH-35 rod hook at issue.

A motion to amend may be denied based on "futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).  A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.  *Jefferson County School District No. R–1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).

Therefore, Weatherford's request to amend its answer to admit that "a limited express warranty exists and applied to the RH-35 rod hook . . . as outlined in the written terms and conditions governing its sale . . . " based on the written warranties on the back of its blank, form credit application is denied as futile.  [Doc #88-1, ¶53]

As to its request to amend in order to assert its "Twenty-First Separate Defense" that "Plaintiffs' tort claims are barred by the economic loss rule," I agree with Weatherford's contention that the economic loss rule is applicable here as a matter of law as discussed below and, as such, amendment to include it as a separate defense is not necessary.  [Doc #88-1 ¶21]

Therefore, based on the foregoing, I deny Weatherford's motion to amend its answer. *Foman v. Davis, supra*, 371 U.S. at 182)(ruling that grant or denial of an opportunity to amend is within the discretion of the District Court).

### III.  SUMMARY JUDGMENT MOTION

In its motion for partial summary judgment, Weatherford seeks entry of judgment in its favor, pursuant to Fed. R. Civ. P. 56, on Ensign's tort claims (Negligence and Strict Liability) on the basis that they are precluded by California's economic loss rule.  Weatherford also asserts, as a matter of law, that Ensign is not entitled to certain damages it seeks – specifically, for its lost profits and increased workers' compensation insurance costs.

### A.  Standard of Review

The purpose of a summary judgment motion under Fed.R.Civ.P. 56 is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995).  Fed.R.Civ.P. 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Id.* at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex Corp. v. Catrett, supra*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Id.* at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares v. ConAgra Poultry Co., supra*, 971 F.2d at 494.

**B. Tort Claims – Economic Loss Rule**

Weatherford first argues that California's economic loss rule applies as a matter of law to bar Ensign's tort claims (for Negligence and Strict Liability) against it for the alleged defective manufacture of the RH-35 rod hook at issue in this case. The parties agree that California law

applies.

The California economic loss rule generally bars tort claims for contract breaches, thereby limiting contracting parties to contract damages. *United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*, 660 F.Supp.2d 1163, 1180 (C.D. Cal. 2009); *see also Aas v. Superior Court,* 24 Cal.4th 627, 643, 101 Cal.Rptr.2d 718, 12 P.3d 1125 (2000)(noting that "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations"). The rule "prevents the law of contract and the law of tort from dissolving into one another." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 988, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004). By preventing tort claims, the rule encourages parties to reach a mutually beneficial private bargain. *United Guar. Mort. v. Countrywide, supra,* 660 F.Supp.2d at 1180. "As such, the economic loss rule is particularly strong when a party alleges commercial activities that negligently or inadvertently [went] awry." *FDIC v. CoreLogic Valuation Servs., LLC*, 2011 WL 5554324 (C.D. Cal. 2011)(unpublished)(*quoting Robinson Helicopter v. Dana Corp.*, 34 Cal.4th at 991 FN7).

California recognizes exceptions to the economic loss rule, which fall into two broad categories. The first category arises in the products liability context, as here, where the rule may be overcome by allegations of "personal injury or damages to other property [besides the defective product]." *Robinson Helicopter v. Dana, supra*, 34 Cal.4th at 988 (*citing Jimenez v. Superior Court,* 29 Cal.4th 473, 482, 127 Cal.Rptr. 2d 614, 58 P.3d 450 (2002)) ; *see also Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873-77 (9th Cir. 2007)(noting that the economic loss rule in product liability cases "is intended to maintain traditional limits on manufacturers' liability provided by the law of warranty, except in cases of physical injury to

persons or property"). Economic losses include, *inter alia*, damages for inadequate value, costs

of repair and replacement of the defective product and consequent claims of lost profits.

*Sacramento Regional Transit Dist v. Grumman Flexible*, 158 Cal App 3d 289, 294, 204 Cal.Rptr

736 (1984).

In this case Ensign is not seeking damages for the personal injury incurred by Mr.

Bolton.  Rather, it seeks collateral economic damages it contends it incurred as a result of the

alleged failure of the RH-35 rod hook.  As such, Weatherford asserts that Ensign has failed to

show personal injury or property damage.  Ensign argues, in response, that the personal injury of

its employee, Mr. Bolton, caused by the defective RH-35 hook, means that the economic loss

rule is not applicable in this products liability case.  In its briefing, Ensign notes that "none of the

cases cited by Weatherford require that the injury be personal to the plaintiff or its property."

[Doc #93 pg. 20]

It is clear, however, that Ensign – as the plaintiff in this case – did not suffer any physical

injury.  Rather, Mr. Bolton did and, so, he alone has standing to sue for his personal injuries.

The only injuries Ensigns alleges it has incurred result in economic damages in the form of

increased workers' compensation premiums and lost profits, as well as the costs it incurred

related to the accident and to replace the RH-35 rod hook.   I agree with Weatherford that Ensign

cannot rely on its employee's personal injuries to escape California's economic loss rule under

the products liability exception.  As set forth generally in *Robinson Helicopter v. Dana, supra*,

the economic loss doctrine is based on the distinction "between transactions involving the sale of

goods for commercial purposes where economic expectations are protected by commercial and

contract law, and those involving the sale of defective products to individual consumers who are

injured in a manner which has traditionally been remedied by resort to the law of torts." 43 Cal

4th at 988 (*quoting Neibarger v. Universal Cooperatives, Inc.*  439 Mich. 512, 486 N.W.2d 612,

615 (1992)); *see also Dubbs v. Glenmark Generics Ltd.,* 2014 WL 1878906 (C.D.Cal. May 9,

2014)(unpublished)(ruling that the economic loss rule applied to the tort claims of a father

against a drug manufacturer when the physical injury – in the form of an unwanted pregnancy –

occurred to his ex-girlfriend); *Ales-Peratis Foods Int'l, Inc. v. American Can Co.,* 164

Cal.App.3d 277, 209 Cal.Rptr. 917 (1985); *Hooper v. Davis-Standard Corp.,* 482 F.Supp.2d 157,

160 (D. Mass. 2007)(ruling that an employer could not recover its economic losses from the

manufacturer's defective machine – rendered unusable after it injured employee – under

Massachuset's economic loss rule as the employer "can only allege economic loss rather than

personal injury or damage to other property"); *see also Mountain West Helicopters v. Textron,*

*Inc.,* 13 Fed.Appx. 855, 856 (10th Cir. 2001)(not selected for publication)(affirming a district

court ruling which held that, under Idaho law, that a helicopter owner's economic losses were

not recoverable when it's employee suffered personal injuries in the crash).

California's economic loss rule has a second category of exceptions for breach of a non-

contractual duty; these exceptions require the breach of a tort duty apart from the general duty

not to act negligently.  *United Guar. Mort. v. Countrywide, supra,* 660 F.Supp.2d at 1180 (*citing*

*Robinson Helicopter v. Dana, supra*, 34 Cal.4th at 988).  California courts have found

exceptions to the economic loss rule in the this category where the conduct also:  (1) breaches a

duty imposed by some types of "special" or "confidential" relationships; (2) breaches a duty not

to commit certain intentional torts, such as fraud or conversion; or (3) was committed "intending

or knowing that such a breach will cause severe, unmitigable harm in the form of mental

anguish, personal hardship, or substantial consequential damages." *United Guar. Mort. v. Countrywide, supra,* 660 F.Supp.2d at 1180 (*quoting Robinson Helicopter v. Dana, supra*, 34 Cal.4th at 989-90); *see also Erlich v. Menezes,* 21 Cal.4th 543, 551, 87 Cal.Rptr.2d 886, 981 P.2d 978 (1999)(listing instances in which tort damages were allowed in contract cases).

The California Supreme Court emphasizes that application of these exceptions focuses on intentional conduct, and admonished courts to "comprehensively consider the implications of their holdings" before allowing tort claims to invade contractual relationships. *United Guar. Mort. v. Countrywide, supra,* 660 F.Supp.2d at 1181 (*quoting Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 688, 254 Cal.Rptr. 211, 765 P.2d 373 (Cal. 1988)).  "In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Erlich v. Menezes, supra,* 21 Cal.4th at 552.

I first address Ensign's argument that a "special relationship" is present here. Specifically, Ensign asserts that Weatherford owed it a special duty to exercise reasonable care in the design, manufacturing, testing, marketing, distributing, and sale of the RH-35 rod hook because Weatherford meets the test of a "special relationship" with Ensign and its employees. And, because Weatherford breached its extra-contractual duty, based on this special relationship, Ensign argues that its tort claims are excepted from the economic loss rule.

California recognizes an exception to the economic loss rule when there is a special relationship between the parties; the term "special relationship" refers to those situations where the relationship is such that it would be equitable to impose a duty to exercise due care to avoid purely economic loss. *American Law of Products Liability 3d*, § 60:65 (Matthew J. Canavan, ed.

1994).  The California Supreme Court has "held that a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity [can] support recovery if the defendant was under an [extra-contractual] duty to protect those interests."  *Platte Anchor Bolt, Inc. v. IHI, Inc*, 352 F.Supp. 2d 1048, 1052 (2004)(citations omitted).  Determining whether a such special relationship exists depends on a balancing of the following factors:  (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm.  *Id.; Ott v. Alfa-Laval Agri, Inc.*, 31 Cal.App.4th 1439, 37 Cal. Rptr. 2d 790 (Cal. App. 5th Dist. 1995)(certified for partial publication); *see also J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979).  These factors essentially help identify whether there is an unusual degree of foreseeability of the particular injury the plaintiff has suffered.  *Ott v. Alfa-Laval, supra,* 31 Cal.App.4th at 1450.  This exception only applies to an extremely limited group of cases.  *American Law of Products Liability 3d*, § 60:65

In making its argument, Ensign contends that the sale of the RH-35 hook was clearly intended to affect it, as the end user of the safety latch, and that the foreseeability of harm to people or property – given evidence that Weatherford was aware of problems with perform of the hook – was high.  In addition, Ensign argues that its injuries (in the form of insurance deductibles, rig downtime, increased workers' compensation insurance premiums and lost profits) were certain.  As to the closeness of the connection between the defendant's conduct and the injury suffered, Ensign maintains that such connection is "intimately close" as the defective

manufacture, and the failure to warn, directly resulted in the accident and to Ensign's losses. Finally, Ensign argues that Weatherford knew of and concealed potential defects before the accident and, as a result, public policy supports placing responsibility for the economic impact of failed safety devices at the feet of manufacturers to bear the cost of preventing injury from the use of its products.

However, I agree with Weatherford that Ensign cannot claim a special relationship in this case. California law is clear that "a critical foundational requirement for finding a special relationship is whether the third-party transaction was intended to affect the plaintiff in a particular way." *Platte Anchor Bolt v. IHI, supra*, 352 F.Supp.2d at 1054 (citations omitted). In this case, the is no evidence that the RH-35 rod hook was intended to affect Ensign in any way particular to them, "as opposed to all potential purchasers" and thus "becomes a traditional products liability or negligence case in which economic damages are not available." *Ott v. Alfa-Laval, supra,* 31 Cal.App.4th at 1455-56; *see also Dubbs v. Glenmark Generics, supra,* 2014 WL 1878906 (ruling that "simply because economic injury is a foreseeable outcome of a particular action is insufficient in and of itself to support a finding of a 'special relationship' and, consequently, the imposition of a duty to prevent such economic harm" when a manufacturer has no specific knowledge of a particular party)(*citing Worldvision Enter., Inc. v. Am. Broad. Co., Inc.*, 142 Cal.App.3d 589, 596, 191 Cal.Rptr. 148 (1983)).

Ensign also contends that Weatherford's conduct rises to the level of an intentional breach of non-contractual duty that, under California law, excepts it from the economic loss rule. Specifically, Ensign asserts that Weatherford acted intentionally in that it knew (or should have known) that the RH-35 rod hook's safety mechanism was defective. In addition, Ensign alleges

that Weatherford failed to warn its customers and "intentionally concealed a substantial risk of injury" and, in so doing, it "knew its actions were likely to cause severe unmitigated harm in the form of substantial consequential damages." [Doc #93 pg. 22]

However, I agree with Weatherford that Ensign has not alleged intentional conduct by Weatherford, such as fraud or misrepresentation, that would constitute an independent duty outside of its contractual obligations in this case. Rather, it presents only classic claims of negligence and strict liability. Any failure to act or warn – based on Weatherford's alleged knowledge that the RH-35 rod hook was defective – does not rise to the level of intentional conduct necessary to except it from the economic loss rule under California law. *See Robinson Helicopter v. Dana, supra*, 34 Cal.4th at 993 (ruling that its holding was "narrow in scope and limited to a defendant's affirmative representations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss").

Therefore, I conclude that California's economic loss rule applies here to bar Ensign's tort claims in which it seeks damages incurred following the accident allegedly caused by the defective RH-35 rod hook manufactured by Weatherford. Accordingly, I will enter judgment in favor of Weatherford on Ensign's claim for Negligence (First Claim for Relief) and Strict Liability (Second Claim for Relief).

## C. Damages

Weatherford also argues that, as a matter of California law, Ensign cannot recover its: 1) lost profits incurred from the reduction in business activity following the accident allegedly caused by the defective RH-35 rod hook; or 2) the increased premiums associated with Ensign's workers' compensation insurance relating to the accident.

I first address Ensign's request for damages in the form of the lost profits it claims to have incurred as a result of the accident caused by the defective RH-35 rod hook.  In seeking these damages, Ensign asserts as follows.  Following the accident, an Ensign employee (William Roper, now deceased) was told by unidentified Vintage employees (the land lease operator that contracted with Ensign for its well servicing on several of its rigs, including Rig No. 333) that "Ensign would be moved to the front of the line for layoffs."  The reason was that Ensign was to be "made an example of" following the accident involving Mr. Bolton in May 2011.  Then, in late 2012 and early 2013, Vintage "severely cut back its use of Ensign Rig Nos. 323, 333, 338 and 339, resulting in lost profits to Ensign."  Ensign contends that four of its eight well servicing rigs used by Vintage were shut down earlier or before its competitors during an industry-wide slowdown.  Ensign's expert reviewed the historical profit data and concluded that Ensign lost profits for the cutback in services was in the range of $920,000 to $1,510,000.

Lost profits may be recoverable as damages for breach of a contract.  *Sargon Enterprises, Inc. v. University of Southern Cal.,* 55 Cal.4th 747, 773, 149 Cal.Rptr.3d 614, 288 P.3d 1237 (2012).  "The general principle is that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent."  *Id.* at 773-74 (*quoting Grupe v. Glick,* 26 Cal.2d 680, 693, 160 P.2d 832 (1945)).  Such damages must "be proven to be certain both as to their occurrence and their extent, albeit not with 'mathematical precision.'"  *Id.* (*quoting Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.*, 34 Cal.4th 960, 975, 22 Cal.Rptr.3d 340, 102 P.3d 257 (2004)).

Weatherford asserts that the evidence is insufficient, as a matter of law, for a jury to find that Vintage cut back on Ensign's rigs because of or due to the accident.  And, so, Ensign cannot

14

prove damages in the form of lost profits.  I agree.

As an initial matter,  Ensign does not dispute that in the 18 to 24 months following the accident, there was an industry-wide slow down in oil and gas production in California.  However, Ensign relies on the following evidence in support of its contention that a fact finder could conclude that, at the time of the industry slowdown, Vintage cutback on its rigs serviced by Ensign in retaliation for the accident.  First, it relies on Mr. Roper's statement to its expert that Vintage intended to move Ensign to the front to the line for layoffs.  However, Ensign does not rebut Weatherford's claim that such statement would clearly be inadmissible hearsay and, perhaps, double hearsay.  While Weatherford's expert agreed that such information was properly considered by Ensign's expert in his calculations, such admission does not support a factual determination that Vintage made that decision or even that the cutbacks occurred.  I reject Ensign's assertion that Mr. Greens's testimony that "the Bolton accident hurt Ensign, even during 2012," standing alone, supports Mr. Roper's alleged statement.   Ensign has provided no evidence that supports an inference that Ensign was hit first or hit more harshly than any other well rig service provider by Vintage or its parent company.

Furthermore, although the personal injury case related to the accident was "very active" at the time of the rig cutbacks, there is no evidence connecting Vintage's involvement in the litigation with its cutbacks of Ensign's rigs beyond the inference that such activity might effect Vintage's decision-making process.  Such inference is undermined by the fact that Vintage was fully indemnified by Ensign in the personal injury case.  In addition, as noted by Weatherford, Vintage was going through a re-organization at the time of the cutbacks and was involved in an unrelated dispute with Ensign for unpaid excess rig hours.  As with most business decisions, the

factors are varied and the inference that any cutbacks to Ensign was based on the accident is attenuated at best.  More importantly, although Ensign discredits Weatherford's evidence that other rigs were cutback first, it cannot prove the opposite – that its rigs were, in fact, cut before others.

I note that both parties refer me to the Master Service Agreement (MSA) between Ensign and Vintage as evidence supporting their positions.  However, the terms of the MSA do not provide any evidence related to whether Vintage cutback Ensign's service hours in response to the accident.  For example, Ensign notes that the MSA required it to provide Vintage with well service rigs and servicing, for pre-established hourly rates, for a five-year term from January 1, 2001 through December 31, 2015. [Doc #90-6]   Ensign claims that its lost profits are based on the layoff of its rigs in only the second year into the five-year contract, resulting in lost revenues and profits.  Ensign maintains that it expected its rig hours to extend "far beyond the two-year, 2,500-hour commitments as established by their prior use" and such expectation is a proper basis for their expert's lost profit calculation. [Doc #93 p. 40]   Weatherford notes, however, that the MSA minimum rig hour commitment was met for each of the four rigs cut back.  In addition, the MSA provides that Vintage had the right to terminate the MSA, with or without cause and without penalty, with 30 days written notice.  Nonetheless, while the terms of the MSA may be relevant to the amount of expected profits, they are not material to the underlying question of whether Ensign lost business based on Vintage's decision to cutback on Ensign's hours first, over other competitors, in the subsequent economic downturn.

Contrary to Ensign's argument here, the evidence – even when viewed in its favor – is insufficient to create a material issue of fact as to whether it incurred lost profits as a result of it

16

being cutback due to the accident.  The conclusion that Vintage decided to make an example of

Ensign based solely on inadmissible hearsay of a deceased Ensign employee is inadequate,  as a

matter of law, to support a conclusion that any lost profits incurred by Ensign occurred when

Vintage chose to slow production on rigs serviced by Ensign due to the accident.

Ensign also seeks damages in the form of its increased workers' compensation insurance

premiums.  Weatherford argues, and I agree, that these damages are not recoverable as a matter

of California law.

Neither party has provided me with California authority that directly addresses whether a

plaintiff can recover such damages following a defendant's breach of express or implied

warranties.  However, in *Fischl v. Paller & Goldstein*,  231 Cal.App.3d 1299, 1301, 282

Cal.Rptr. 802 (1991), the First District California Court of Appeal held that "an employer does

not have a cause of action to recover damages for increased workers' compensation insurance

premiums and lost profits incurred as a result of negligent injury to its employee" under general

negligence principles or under the California workers' compensation statute.  The court further

observed that "there is no general negligence cause of action in California for an employer

seeking recovery for expenses and lost profits incurred as a result of negligent injury to its

business employee." *Id.* at 1303.  The Court's ruling is based, in part, on the rationale that the

damages in the form of workers' compensation increases and lost profits are too far removed and

unforeseeable from the negligent act that injured the employee.  In addition, the Court found that

the plaintiff was foreclosed from recovering such damages under California's Labor Code

because an increase in insurance premiums is not "compensation" recoverable by an employer

against a third party. *Id.* at 1304 (*citing* Cal. Lab. Code § 3856).

Although I have dismissed Ensign's claims that sound in tort, I find that the ruling in *Fischl v. Paller & Goldstein*, *supra*, is likewise applicable to the damages sought here by Ensign for breach of warranties.  I reject Ensign's argument to the extent that it relies upon case law from Ohio that allows an employer to recover contract damages for increased workers' compensation premiums from third parties when it negligently injures an employer's employee and such injury is a direct result of a breach of contract between the third party and the employer. *See Cincinnati Bell Tel. Co. v. Straley*, 40 Ohio St.3d 372, 380-81, 533 N.E.2d 764 (1988).  Rather, I conclude that in light of the ruling and rationale set forth in *Fischl v. Paller & Goldstein*, *supra*, California law comports with the majority of other jurisdictions which have ruled that increased in workers' compensation premiums are not recoverable against a third party for breach of contract. *See e.g. Sanford-Brown Co. v. Patent Scaffolding Co.*, 199 Ga. 41, 33 S.E.2d 422 (1945)(ruling that an increase in the employer's workers' compensation premiums was too remote to be recovered in a breach of contract claim against the manufacturer of defective scaffolding, the failure of which allegedly caused the plaintiff's employee's death).

I conclude that Ensign is foreclosed from seeking both its lost profits (based on the theory that its rigs were cutback first, during an industry slow-down, due to the accident) and its increased worker's compensation premiums from Weatherford in this case.

ACCORDINGLY, based on the foregoing, I rule as follows:

1) I DENY Defendant Weatherford's Motion for Leave to Amend Answer [**Doc #80**];

2) I GRANT Defendant Weatherford's Motion for Partial Summary Judgment and, as such, I ENTER JUDGMENT in favor of Defendant Weatherford's on Plaintiff(s) Ensign's First Claim for Relief for Negligence and Second Claim for Relief for Strict Liability [**Doc #90**]; and

3) Plaintiff(s) Ensign may not recover: its lost profits incurred from the reduction in business activity following the accident allegedly caused by the defective RH-35 rod hook and the increased premium costs associated with its workers' compensation insurance relating to the accident.

Dated: July __27__, 2015 in Denver, Colorado.

BY THE COURT:

    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE